**BIPPUS v. BIPPUS.**

No. 12373.

Court of Civil Appeals of Texas.
San Antonio.

Jan. 30, 1952.

James D. Kennedy, San Antonio, for appellant.

G. Woodson Morris, San Antonio, for appellee.

W. O. MURRAY, Chief Justice.

This is a divorce suit instituted by Helen M. Bippus against her husband, Scott Bippus, wherein she sought a divorce upon the grounds of abandonment, cruel treatment and adultery on the part of the husband. The divorce was opposed by the husband. The trial court after hearing much evidence entered a judgment granting the divorce. From this judgment Scott Bippus has taken this appeal.

Appellant's first point is that the evidence was insufficient to support the judgment on the grounds of cruel treatment. Article 4629, Vernon's Ann.Civ.Stats., provides:

"A divorce may be decreed in the following cases:

"(1) Where either party is guilty of excesses, cruel treatment, or outrages toward the other, if such ill treatment is of such a nature as to render their living together insupportable. * * *

"(3) In favor of the wife, where the husband shall have left her for three (3) years with intention of abandonment, or where he shall have abandoned her and lived in adultery with another woman.

"(4) Where a husband and wife have lived apart without cohabitation for as long as ten (10) years."

Appellant and appellee were married in 1933 in Texarkana, Arkansas, and thereafter lived together in Houston, Texas, for a period of about five years. Mrs. Bippus became sick and decided that the Houston water was not agreeing with her, whereupon her husband brought her to San Antonio, Texas, to live. She secured employment in San Antonio and thereafter earned her own living. There was apparently no intention on the part of appellant and appellee to permanently separate at the time she moved to San Antonio. Appellant did not visit her here in San Antonio for a period of one year, but thereafter he came to see her at regular intervals, sometimes once a week, sometimes once a month. On these visits they cohabited together as man and wife, often renting a tourist cabin and spending from one to three days together. On February 26, 1951, Mrs. Bippus instituted this suit for divorce. She testified that there were no children born of the marriage; that during the time she was married to Mr. Bippus he treated her very kindly, and that pertained to the whole time they were married. However, following this general statement she testified that they often quarreled and fussed; that on one occasion he pulled a gun on her and scared her very much, and on two other occasions he choked her until everything turned black, and that she learned from friends and from his own admissions that during the thirteen years she resided in San Antonio, he lived with another woman in Houston, Texas. She said that he would deny this, but that he told so many untruths that she couldn't believe anything he said. After she came to San Antonio to live in 1938, she and her husband lived apart, except for a period of about five months during which time she tried to live with him in Houston, Texas, but that it wouldn't work out, and they quarreled and fussed and she returned to San Antonio; that her husband drank practically all the time during these five months. During the time she resided in San Antonio he had given her only $75, $25 of which was given her when she had to go to the hospital for her operation, and the remaining $50 was given to her when she visited her mother in a distant State. Mr. Bippus testified that he didn't make much money, although at the time of said trial he had accumulated property valued at from four to five thousand dollars. He never failed to give her a present at Christmas, on their wedding anniversary and on her birthday. Mrs. Bippus admitted that on or about January 15th or 16th, 1951, her husband visited her in San Antonio, and that they spent one or two days at a tourist cabin where they cohabited as man and wife. This was five or six weeks before she instituted the suit for divorce. Mr. Bippus testified that they cohabited in February, just about one week before the suit was filed, and in this he was supported by L. E. Collins, manager of a tourist cabin, but this was denied by Mrs. Bippus. Mr. Bippus testified, corroborated by the testimony of his daughter, that he and his daughter and Mrs. Bippus had dinner together at Christie's Restaurant in the City of San Antonio after the suit was filed, and that this dinner cost him more than $5. On this occasion he gave his wife a present consisting of some jewelry, which she returned to him some three or four days later. With reference to meeting and dining together at Christie's Mrs. Bippus simply stated that it was a frame-up, she didn't deny the fact.

■ We are of the opinion that this testimony of cruel treatment on the part of Mr. Bippus does not justify the granting of a divorce, because Mrs. Bippus had condoned such conduct by thereafter, on many occasions, cohabiting with him as man and wife.

It is true that Mrs. Bippus testified that her husband drew a gun on her on one oc-

casion, and choked her on two other occasions, but none of these instances caused her to cease to cohabit with him as his wife. It is true that she testified that in each instance he promised not to repeat such acts, but she also said that he would not tell the truth and that she could not put any confidence in any promise that he made her. Mr. Bippus did not support her during the time that she lived in San Antonio, but she was always able to secure work as a practical nurse and seemed to suffer no particular hardship for the want of money; she was able to make herself a good living. She testified that she wore clothes made out of flour sacks, which would indicate some hardship, however, she said that she had a position where she received her room and board and $50 a month, which would provide for her necessities of life. She testified that fussing and quarreling made her nervous and at the time of her operation she was very nervous and that this nervousness affected her health.

Appellee was fully aware of the fact that her husband was living with another woman in Houston, Texas, during the thirteen years that she resided in San Antonio, and with knowledge of this fact she continued to cohabit with him as his wife.

■ However, regardless of everything else, appellee, by continuing to cohabit with her husband with full knowledge of all of the misconduct to which she now testifies, condoned this misconduct, and she cannot now set it up as grounds for divorce. It is true that his acts of misconduct are not condoned if, as and when they are thereafter repeated. The facts here show that in January, before the divorce suit was filed in February, appellee was cohabiting with appellant as her husband, and the only thing which she alleges happened after the middle of January, 1951, was that she and appellant had another quarrel. There is no attempt to prove the details of this quarrel, or how it was provoked, or what caused it to take place. This was not sufficient to set aside the fact that she had theretofore completely condoned all of the misconduct that had theretofore taken place.

The doctrine of condonation is defined in 17 American Jurisprudence, page 248, as follows: "The doctrine of condonation, which may be defined as forgiveness, express or implied, by one spouse for a breach of marital duty by the other with the implied condition that the offense shall not be repeated, is a defense which will bar the condoning spouse of the right thereafter to seek a divorce for the condoned offense, at least until it is revived by subsequent misconduct."

In 15 Texas Jurisprudence, page 498, it is defined as follows: "Condonation consists in forgiveness upon condition that the injury shall not be repeated, and is dependent upon future good usage and conjugal kindness. To this may be added that forgiveness results in barring the aggrieved spouse's right to sue for divorce, unless the conditions are broken."

Apparently there was no reason for appellee to continue to cohabit with appellant unless she wanted to condone his previous misconduct. She was earning her own living and resided in San Antonio while he was residing in Houston. They had no children and she testifies to no reason why she continued to cohabit with him which would suggest anything other than that she was willing to condone his misconduct. She admits that she was cohabiting with him on January 15th or 16th, and, according to the testimony of appellant, they were cohabiting in February, 1951. She admits that she had dinner with him at Christie's Cafe in San Antonio after the suit was filed. She does not deny that she left that place in an automobile in company with him, they drove to Brackenridge Park and there she kissed him. He testified, and she does not deny, that after the divorce suit was filed she gave him one of the best kisses he ever had in all of his life. The testimony upon which appellee seeks a divorce is entirely given by her and she is not corroborated by any other witness. The testimony of appellant is corroborated by his daughter, his son-in-law, and L. E. Collins, who operated the tourist court where he and his wife regularly went for the purpose of spending week-ends together and cohabiting as man and wife. Appellant testified that the woman with whom he was accused of living in Houston had left the city and that he did

not now know of her whereabouts. He is past seventy years of age and appellee is fifty-eight years of age. It would seem from the evidence that they are now in a better position to live happily together than they have been for the past thirteen years, during which time she was contented to cohabit with him as his wife.

The marital relation is one in which not only the parties thereto but also the government has a very great interest. The permanency of marriage and the maintaining of the home is the very basis of our government and our civilization, and the courts do not lightly cast asunder these important and sacred relations. Divorce should never be granted except on full and satisfactory evidence showing that it will be intolerable for the parties to continue the marital relation. Where a wife has lived with her husband for some eighteen years and condoned whatever misconduct he may have been guilty of, she should not be permitted to secure a divorce after he has arrived at the age of seventy-one years, and is apparently willing not to be guilty of misconduct in the future, and where the only misconduct which has occurred since the former condoned misconduct, is one fuss, not shown to be of any serious nature.

The judgment of the trial court is reversed and judgment here rendered denying the divorce.

NORVELL, Justice.

I concur in the order reversing the judgment appealed from. The evidence indicates that the appellant at times since the marriage of the parties in 1933 was guilty of acts of cruel treatment toward the wife. However, appellee admits that she cohabited with her husband in January of 1951. By so doing, she condoned the acts of cruel treatment theretofore committed by the husband. Condonation, however, operates as a bar to a divorce only so long as "the injured party is * * * treated with conjugal kindness in the future, and, when not accorded this, the former acts of cruelty are revived." Barta v. Barta, Tex. Civ.App., 283 S.W. 201; Tinnon v. Tinnon, Tex.Civ.App., 278 S.W. 288; Crittenden v. Crittenden, Tex.Civ.App., 214 S.W.2d 670;

Thompson v. Thompson, Tex.Civ.App., 231 S.W.2d 496.

Upon the question of appellant's failure to treat his wife with conjugal kindness, the record discloses nothing more than that the parties had a quarrel in February and that the suit was filed on the 26th day of said month. No details of the quarrel are related and it cannot be ascertained whether or not appellant was at fault. Appellee's testimony is as follows:

"Q Now, did he try here lately to get you to come back to him? A No, because I told him I could not live with him under those conditions. When he was here in February we had a big fuss and I told him that I was going to file a suit for a divorce. That I could not live with him under those conditions. * * *

"Q * * * Over the period of time you were together, how did you make out, you and Mr. Bippus? A Well, we had arguments. We had a big fuss Christmas, and we had another one in January, and another one in February.

"Q In all those years, in that period of time, from 1938 down to 1951, say, during the first part of February, 1951, at the various times when he was here from time to time, how did you get along? Did you get along pleasantly or otherwise? A No, it was always an argument.

"Q It was always an argument. Tell the Judge what you would argue about? A We would argue about first one thing and another.

"Q How did that affect you? A It made me very nervous. * * *

"Q How many times this year, since January, have you stayed with your husband down at Burton's Tourist Courts? A January was the last time.

"Q How about February? A I didn't stay with him in February, because I didn't go out there. We had had a big quarrel. He asked me to go out there and I said positively no."

The above quoted evidence, and that is all there is upon the point, is insufficient to show that appellant breached the condition of the condonement.